**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ajilon Professional Staffing, LLC, a Delaware company, | No. CV-09-561-PHX-DGC |
| Plaintiff, | **PRELIMINARY INJUNCTION** |
| vs. | |
| Shad and Jane Doe Griffin; and The Lucas Group, a limited liability company, | |
| Defendants. | |

Plaintiff Ajilon Professional Staffing, LLC ("Ajilon") provides staffing services to businesses seeking financial professionals and accountants for part-time and permanent placements. In January 2009, Shad Griffin left his position as an executive recruiter for Ajilon and began working as a recruiter for Lucas Associates, Inc. ("Lucas"), one of Ajilon's competitors. Ajilon filed a complaint against Griffin and Lucas on March 20, 2009. Dkt. #1.

Following a hearing on March 24, 2009 (Dkt. #18), the Court entered a stipulated temporary restraining order that essentially prohibits Griffin from breaching confidentiality and non-solicitation provisions in his employment agreement with Ajilon. Dkt. #17; *see* Dkt. #13 at 4-5. On April 10, 2009, the Court entered a temporary restraining order that included the non-compete provision of the employment agreement. Dkt. #27. On May 27, 2009, the Court heard evidence on Plaintiff's request for a preliminary injunction. Dkt. #61.

To obtain a preliminary injunction, a plaintiff must show that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. NRDC*, --- U.S. ---, 129 S. Ct. 365, 374 (2008); *see Am. Trucking Ass'n, Inc. v. City of L.A.*, --- F.3d ---, 2009 WL 723993, at *4 (9th Cir. Mar. 20, 2009). The Court will address each of these requirements.

**I.  Success on the Merits.**

The non-compete provision in Griffin's employment agreement provides, in pertinent part:

> For a period of one year after the termination of this Agreement, Employee will not, within a radius of fifty (50) miles from the present place of business of the Employer, . . . directly or indirectly own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation or control of any business similar to the type of business conducted by Employer.

Dkt. #13 ¶ 11. Ajilon argues that the work Griffin performs for Lucas constitutes a clear breach of the non-compete provision. Dkt. ##3, 23. Defendants concede that Lucas's business is "similar" within the meaning of the agreement, but contend that the provision is unreasonable and unenforceable as a matter of law. Dkt. #22.

Griffin's employment agreement is governed by New Jersey law. *See* Dkt. #13 ¶ 17. New Jersey courts "have consistently utilized a reasonableness test to determine the enforceability of restrictive covenants." *Cmty. Hosp. Group, Inc. v. More*, 869 A.2d 884, 895 (N.J. 2005). The determination of whether a non-compete provision is reasonable involves a three-part inquiry: (1) whether the provision protects legitimate business interests, (2) whether it would cause undue hardship, and (3) whether enforcement of the provision would be consistent with public policy. *See id.* at 897; *see also Solari Indus., Inc. v. Malady*, 264 A.2d 53 (N.J. 1970). The Court will address each part of the New Jersey test.

**A.  Legitimate Interests.**

As part of the first inquiry – whether the provision protects legitimate business interests – New Jersey courts recognize three possible interests: the protection of confidential information, the protection of clients and client referral sources, and the protection of an investment in an employee. *See Cmty. Hosp.*, 869 A.2d at 897. The non-

compete provision in this case protects the second and third categories of legitimate business interests.

Griffin's competition in the Phoenix area likely will draw away existing and potential Ajilon clients even if Griffin undertakes no effort to actively solicit them. This likelihood is created by the skills, reputation, and visibility Griffin developed in the business during his twelve years at Ajilon, and by efforts he made to advertise his departure from Ajilon and his affiliation with Lucas. Evidence presented at the preliminary injunction hearing established that Griffin is one of the top two or three financial services and accounting recruiters in the Phoenix area. When he left Ajilon, he sent an email to his hundreds of Ajilon contacts advising them of his departure and providing his personal cellular phone number. When he started at Lucas, he sent an announcement to his Ajilon contacts that he was now employed at Lucas, and he began sending them weekly emails as he had done at Ajilon. Griffin has received telephone calls at Lucas from former Ajilon customers.

Griffin's competition at Lucas will also unfairly take advantage of the investment Ajilon made in Griffin. This is not a case where Griffin simply brought his "tools of the trade" to Ajilon and took them when he left. *Cf. Coskey's TV & Radio Sales and Service, Inc.*, 602 A.2d 789, 795 (N.J. Super. Ct. App. Div. 1992). Griffin had never worked in the recruiting field before joining Ajilon. He received substantial training and mentoring during his twelve years there, rising from a recruiter who brought in $189,000 per year to almost $800,000 per year. This investment by Ajilon – this training and development of Griffin as a finance professional recruiter – would be used to the detriment of Ajilon if Griffin were permitted actively to compete against Ajilon in the Phoenix marketplace. *See id.*

These legitimate interests are not adequately protected merely by preventing the misuse of confidential information or the direct solicitation of Ajilon clients. Griffin's competition in the Phoenix area will unfairly draw away existing and future clients to

1 Ajilon's detriment.[1]

2 Once a legitimate interest has been established, New Jersey cases consider three 3 additional aspects of the non-compete provision: "its duration, the geographic limits, and the 4 scope of activities prohibited." *Id.* The Court finds that the one-year and 50-mile limitations 5 are "no broader than necessary to protect [Ajilon's] interests." *Id.* Evidence at the 6 preliminary injunction hearing established that many if not most of Griffin's customer 7 contacts are Phoenix-based businesses. The Court further finds that it is reasonable to limit 8 Griffin from competing against Ajilon in the business of recruiting in the financial services 9 field. This limitation is somewhat narrower than the terms of the actual provision, which 10 would limit Griffin from working for Lucas in any capacity, but New Jersey courts have 11 made clear that a restrictive covenant is "unenforceable if it restricts the employee from 12 engaging in activities not in competition with those of his former employer." *Karlin v.* 13 *Weinberg*, 390 A.2d 1161, 1169 (N.J. 1978).

14 Defendants contend that a court cannot "blue pencil" the scope of activities limitation. 15 Dkt. #22 at 10 n.10. The cases Defendants rely on contain no such prohibition, but simply 16 state that courts may change the geographical or time limits of a covenant so as to render it 17 reasonable. *See id.* (citations omitted). Other cases make clear, however, that a restrictive 18 covenant may be "given complete or partial enforcement to the extent reasonable under the 19 circumstances." *Cmty. Hosp.*, 869 A.2d at 897 (citing *Whitmyer*, 274 A.2d at 580); *see Cost* 20 *Reduction Solutions v. Durkin Group, LLC*, 2008 WL 3905679, at *3 (N.J. Super. Ct. App. 21 Div. Aug. 22, 2008). This includes limiting the covenant's "application concerning its 22 geographical area, its period of enforceability, *and its scope of activity*." *Coskey's*, 602 A.2d 23 at 793 (emphasis added).

---

[1] Lucas argues that a non-compete provision is enforceable only if it is "necessary" to protect legitimate interests. *See Cmty. Hosp.*, 869 A.2d at 897. The Court finds that Griffin's provision is enforceable even if necessity is required. The Court is satisfied that Griffin will draw away Ajilon customers merely by competing in the Phoenix marketplace, even if Griffin otherwise complies with the confidentiality and non-solicitation provisions of his employment agreement.

**B.     Undue Hardship.**

Once it is determined that the non-compete provision protects a legitimate interest and that the time, geographical limit, and scope of the provision can reasonably be enforced, New Jersey courts consider whether enforcement would impose undue hardship on the employee. *See Cmty. Hosp.*, 869 A.2d at 897. The reason for the termination of the parties' relationship matters. *See id.* Where the application of the non-compete provision "results from the desire of an employee to end his relationship with his employer rather than from any wrongdoing by the employer, a court should be hesitant to find undue hardship on the employee, he in effect having brought that hardship on himself." *Karlin*, 390 A.2d at 423-24.

When Griffin chose to leave Ajilon he was fully aware of the non-compete provision in his employment agreement. He testified that he removed a copy of his agreement from his manager's office in order to hinder Ajilon's enforcement of the provision. He informed Lucas of the non-compete provision and negotiated a $20,000 indemnification if he was sued by Ajilon. Griffin then assumed a position clearly in violation of the non-compete provision and actively solicited Ajilon clients, even uploading his Ajilon client contact information into the Lucas database. Given these facts, Griffin cannot now be heard to complain about the hardship of enforcing the non-compete provision. Enforcement of the provision will not impose undue hardship on Griffin. *See Cmty. Hosp.*, 869 A.2d at 898; *see also Karlin*, 390 A.2d at 424 ("Ordinarily a showing of personal hardship, without more, will not amount to an 'undue hardship' such as would prevent enforcement of the covenant."); *Sunder v. Madalapu*, No. ATL-C-171-00, 2003 WL 23484589, at *5 (N.J. Super. Ct. June 16, 2003) (same).

**C.     Public Interest.**

"The final prong of the test is that enforcement of the restriction should not cause harm to the public interest." *Cmty. Hosp.*, 869 A.2d at 898 (citing *Karlin*, 390 A.2d at 424). Defendants have identified no public policy that would be violated by enforcement of Griffin's non-compete provision. *See* Dkt. #22.

### D. Success on the Merits Summary.

Because the non-compete provision in Griffin's employment agreement protects a legitimate interest of Ajilon, can reasonably be enforced as to time, area, and scope, imposes no undue hardship on Griffin, and is not injurious to the public interest, the Court concludes that Ajilon likely will succeed on its breach of contract claim.

## II. Irreparable Harm.

It is "well-settled that injury to or destruction of a business constitutes irreparable harm for which preliminary and permanent injunctive relief may be appropriate." *U.S. Foodservice, Inc. v. Raad*, 2006 WL 1029653, at *7 (N.J. Super. Ct. Ch. Div. Apr. 12, 2006) (citing *A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.*, 66 A.2d 319, 326 (N.J. 1949)). Indeed, the loss of good will may "constitute irreparable harm, given the difficulties in attempting to quantify future losses." *Global Transp. Logistics, Inc. v. DOV Transp.*, No. BER-C-79-05, 2005 WL 1017602, at *3 (N.J. Super. Ct. Ch. Div. Apr. 5, 2005). Griffin's direct and local competition with Ajilon presents a likelihood of irreparable harm. Although the drawing away of a single client might result in quantifiable damages, the effect of Griffin's local competition on existing and potential future clients of Ajilon cannot readily be quantified.

## III. Balance of Equities.

The Court finds that the balance of equities tips in favor of Ajilon. Griffin signed the non-competition provision and cannot now complain of significant hardship given his voluntary departure from and competition with Ajilon. Ajilon, on the other hand, will experience hardship in the form of irreparable injury if Griffin's breach of the non-compete provision is not enjoined.

## IV. Public Interest.

The final element of the injunctive relief test requires consideration of the public interest. As explained above, Defendants have identified no public policy that would be violated by enforcement of the non-compete provision. The public interest generally favors full and fair competition, but if Ajilon is successful on the merits and shows that Griffin

- 6 -

1 wilfully breached the non-compete provision, "then the public interest would favor
2 enforcement of the [provision] and restraint of [Griffin] from unfair competition[.]" *Mercury*
3 *Cos., Inc. v. First Am. Corp.*, No. 08-cv-00911-WYD-CBS, 2008 WL 4861950, at *9 (D.
4 Colo. Nov. 10, 2008); *see Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140,
5 1149-50 (D. Kan. 2007) (there is "a public interest in upholding enforceable contracts" and
6 "the public interest is served where unfair competition is restrained").

7 **V.    Estoppel and Waiver Defenses.**

8 Defendants argue that Ajilon should be estopped from enforcing the non-compete
9 provision. Dkt. #22 at 10-12. Defendants base this argument primarily on a conversation
10 between Victor Palumbo, a Lucas vice president, and Ryan Becker, a high-ranking Ajilon
11 employee. Defendants contend that Becker indicated Ajilon would not seek to enforce the
12 non-compete provision if Lucas hired Griffin. The Court is wholly unpersuaded by this
13 argument.

14 Estoppel applies only if Lucas relied in good faith on an assurance from Ajilon that
15 the non-compete provision would not be enforced. *See Frick Joint Ventures v. Starwood*
16 *Ceruzzi Union, LLC*, UNN-C-77-04, 2006 WL 3498315, at *12 (N.J. Super. Ct. App. Div.
17 Dec. 6, 2006). The Palumbo-Becker conversation provided no good faith basis for such
18 reliance. Palumbo talked with Becker during a meeting in Atlanta where Palumbo was
19 recruiting Becker for the Lucas job eventually filled by Griffin. Palumbo could not
20 reasonably conclude that Becker was speaking authoritatively on behalf of Ajilon during a
21 meeting where Palumbo was seeking to hire Becker away from Ajilon. Palumbo also knew
22 that Becker had no supervisory authority over Griffin or the office in which he worked.
23 What is more, Palumbo and Lucas were well aware of the risk of litigation if they hired
24 Griffin – they expressly agreed to indemnify Griffin against the financial consequences of
25 such litigation. The Court cannot conclude that Lucas reasonably relied on Becker's
26 statement that the non-compete provision would not be enforced.

27 Nor does the Court find that estoppel arises from the fact that Griffin's manager did
28 not mention the non-compete provision to him before he left, or that Ajilon's initial cease and

- 7 -

desist letter to Lucas did not mention the provision. Neither of these post-hire actions could have induced pre-hire reliance on the part of Lucas.

And Griffin certainly cannot contend that he relied on some assurance that the non-compete provision would not be enforced. He removed a copy of his employment agreement from his manager's office specifically to hinder enforcement efforts, and he demanded an indemnification from Lucas in the event this lawsuit was filed.

Defendants also contend that Becker's comments to Palumbo constituted a waiver of the non-compete provision. But Defendants have presented no evidence that Ajilon, during the very meeting where Lucas was seeking to hire away Becker, voluntarily and intentionally relinquished its rights in Griffin's non-compete provision. *See Knorr v. Smeal*, 178 N.J. 169. 177 (2003) ("An effective waiver requires a party to have full knowledge of his legal rights and intent to surrender those rights.").[2]

## VI. Conclusion.

Ajilon has satisfied the four-part test for injunctive relief: Ajilon is likely to succeed on its breach of contract claim, Ajilon is likely to suffer irreparable harm if Griffin's direct and local competition is not enjoined, the balance of equities tips in Ajilon's favor, and injunctive relief is in the public interest. The Court concludes that a preliminary injunction should be entered to enforce the confidentiality and non-compete provisions of Griffin's

---

[2] Defendants also suggested at the preliminary injunction hearing that Ajilon waived its contract protections by failing to enforce them against other employees who left Ajilon. As Robin Bumgarner testified, however, Ajilon decides on a case-by-case basis whether to institute litigation to enforce non-compete provisions. The decisions turn on the perceived threat of the former employee's competition, the costs of litigation, and other factors. Defendants presented no evidence that the lack of enforcement was based on a knowing and intentional decision by Ajilon to relinquish its rights in all non-compete provisions, including Griffin's. Moreover, the fact that enforcement decisions are made case-by-case – as would always be the case in any business – does not suggest that the non-compete provision fails to protect legitimate interests. A business may reasonably conclude that a provision protects very legitimate interests, but that the cost of litigation outweighs the threat presented by a particular former employee's competition.

1  employment agreement.[3]

2  **IT IS ORDERED:**

3  1. Defendant Shad Griffin shall not disclose any Ajilon confidential information (within the meaning of his employment agreement dated August 26, 1996) to Defendant Lucas Associates, Inc., any employee of Lucas Associates, Inc., or any other person not currently employed by Plaintiff Ajilon Professional Staffing, LLC. For purposes of this preliminary injunction, the words "customer" and "client" in the employment agreement include the company as well as individuals who Griffin contacted at the company.

9  2. By June 26, 2009, Lucas and Griffin shall purge from the Lucas data base all information uploaded by Griffin concerning Ajilon clients, client contacts, titles, or contact information. By June 26, 2009, Lucas shall certify to Ajilon in writing, signed under penalty of perjury by an officer of Lucas, that the purge of the data base has been completed.

13  3. Defendant Shad Griffin shall not knowingly solicit any Ajilon employee or any Ajilon client or applicant with whom he had contact on Ajilon's behalf in the year prior to his departure from Ajilon.

16  4. Defendant Shad Griffin shall not directly or indirectly recruit or manage recruiters in the financial services profession within a 50-mile radius of Plaintiff Ajilon Professional Staffing, LLC's Phoenix office between now and April 10, 2009 (the twelve-month anniversary of the Court's Temporary Restraining Order enforcing the non-compete provision), unless otherwise ordered by the Court. If Griffin receives telephone calls from clients or applicants in the financial services profession during this time period, he shall promptly refer them to other recruiters at Lucas. He may not engage in recruiting activities, and may not update the Lucas database with any information received during such calls.

---

[3] Defendants agreed at the preliminary injunction hearing that the confidentiality and non-disclosure provisions may be enforced by injunction.

5. No financial security will be required for the restraining order.

DATED this 28th day of May, 2009.

*David G. Campbell*
_____
David G. Campbell
United States District Judge